THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MARK JONES *et al.*, Defendants-Appellants.

(No. 56307;

First District (1st Division)—June 4, 1973.

Gerald W. Getty, Public Defender, of Chicago, (Suzanne M. Kohut and James J. Doherty, Assistant Public Defenders, of counsel,) for appellants.

Bernard Carey, State's Attorney, of Chicago, (Elmer C. Kissane, Randall T. Sims, and Mark T. Zubor, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE EGAN delivered the opinion of the court:

The defendants, Mark Jones and Joseph Cross, were found guilty of murder by a jury. Jones was sentenced to a term of 75 to 100 years and Cross to a term of 15 to 45 years. The defendants contend: the introduction of hearsay evidence denied them the right to confront witnesses; they were not proved guilty beyond a reasonable doubt; the trial judge erred in not permitting the meaning of reasonable doubt to be explained to the prospective jurors; there was a fatal variance between the Bill of Particulars and the evidence; and the sentences were excessive.

On January 24, 1970, Lawrence Brown was returning to his truck which was parked on the north side of the street in front of Leonard Mack's store at 3024 West Madison Street. He was pushed into his truck by a short man after he opened the door; as he struggled, the short man began striking him. The short man yelled, "I got one," and he and a tall man, who had been standing nearby, ran away. Brown staggered into the street, and a passing squad car stopped to assist him. He told the police, "I have been cut, stabbed. They tried to rob me." He said his money and wallet were taken and that one man had yellow checked pants and the other a dark jacket. A bystander pointed out the direction in which the men had fled. James Bigelow, one of the first police officers on the scene, left Brown with the detectives and drove in the direction given by the bystander. He testified he saw two men fitting the description he had received walking east on Warren Boulevard, the next block north of Madison. They began to run and went north to a gangway. Bigelow drove to Lake Street another two blocks north and saw the same men walking fast. He told them to stop, but they continued walking until he took out his revolver. They were both breathing heavily. One, the defendant, Jones, was bleeding from a cut on his right hand. He was wearing an apple cap, yellow checked pants and a black three-quarter coat. The other, the defendant, Cross, was wearing dark cloth-

ing. No weapons were found on the defendants. Cross had a ten-dollar bill and three singles. Jones had two five-dollar bills and two singles. The officer saw no blood on the clothing of either defendant.

The stabbing was witnessed by two men, Jerry Bates and Otis Hughes. Bates had been standing near 3100 West Madison for almost three hours waiting to see Hughes, who owns a furniture store at 3016 West Madison. At 8:00 P.M. Bates saw two men coming across the street. They separated, and the short one, whom he later identified as Jones, walked three feet away from him and stood in front of Leonard Mack's store for 25 minutes. The tall one, whom he later identified as Cross, stood leaning against a wall a short distance away for a half hour. Otis Hughes was walking from the cleaners across the street to his truck, which was parked in front of Brown's when the short man made a lurch at him and slipped on the ice. As the short one came toward Hughes, Bates called out to him, and Hughes backed away. Hughes testified that he never took his eyes off the man and that he watched him for five to eight minutes. Brown came across the street from the cleaners, and both men testified that they saw the assault that caused the death of Brown. Hughes testified that he then saw a tall man wearing dark clothes run past him. He never saw his face, but Bates did. Both Hughes and Bates testified that the short one was wearing an apple cap. Both witnesses identified the two defendants in a squad car a short time later. Both testified that Jones was wearing an apple cap and yellow checked slacks and that Cross was wearing dark clothes.

William Nolan, a detective, testified that he spoke to Brown at the scene. When he questioned the defendants, who denied that they had participated in the assault of Brown, Cross said that he had left his home and went to the vicinity of Lake and Kedzie looking for some girls; he said he met Jones at Madison and Kedzie and that they were walking together at Lake and Sacramento when they were arrested.

All of the witnesses for the State testified that the lighting conditions were good due to the street lights and the lights from the stores.

Mark Jones testified that he was walking east on Lake Street near Sacramento when he slipped on the ice scratching his hand, and Joseph Cross, whom he had not known before, helped him up. Both were walking down the street when the police arrested them. He had cashed a Public Aid check for $15 that day and had spent some money for food, leaving him with the amount the police found on him. He said he was wearing beige and green slacks, not yellow, and was not wearing a hat. He denied participating in the crime and that he failed to stop immediately when ordered to do so by Officer Bigelow; he also denied telling Nolan that he cut his hand earlier on Roosevelt Road and that he

was walking from Kedzie to Lake to get exercise. He said that he had told Nolan that he cashed a check earlier that morning; he did not tell Nolan that he just had the money.

An employee of the currency exchange at 3027 West Madison, Betty Blackwell, identified a card with the signature, Mark Jones, on it. It was dated January 24, 1969, and the notation on it indicated that a General Assistance Check had been cashed that day. She said it was possible that the year shown should have been 1970.

Officer William Nolan testified in rebuttal that Jones had told him that he had cut his hand on Roosevelt Road and that he just had the money; he did not tell Nolan that he had cashed a check earlier that day.

■■ The defendants first argue that the testimony of Bates and Hughes was insufficient to identify them as the men responsible for the death of Brown. Bates observed Jones from a distance of three to six feet for almost thirty minutes and Cross for the same period of time, and, although Hughes did not notice Cross' face, Bates saw it from a distance of six feet. Hughes took particular notice of Jones because he was afraid of him. He watched Jones for over five minutes and saw his face. Both witnesses, as well as the deceased, noted the men's clothing, particularly the distinctive pants worn by Jones. All the witnesses for the State testified that the area was well lighted. Under these circumstanes, since the witnesses had ample opportunity to observe the defendants and since their credibility was for the jury, the determination of the fact of identity may not be upset on review. (*People v. Clarke*, 50 Ill.2d 104, 109, 277 N.E.2d 866.) Moreover, the identification was corroborated by the fact that both men were arrested, Jones with a cut on his hand, a few minutes later, a short distance away, under circumstances indicating an attempt to flee, and wearing clothes fitting the description of the wanted men. Under this evidence we conclude that their identification was established beyond a reasonable doubt.

■■ Cross also asserts that the evidence is insufficient to establish his accountability for the conduct of Jones. A person is legally accountable for the conduct of another when, "either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1969, ch. 38, sec. 5—2(c).) If the defendants had a common design to do an unlawful act, then whatever act either of them did in furtherance of the common design was the act of both. (*People v. Armstrong*, 41 Ill.2d 390, 398, 243 N.E.2d 825.) Proof of a common design need not be supported by words of agreement but can be drawn from

the circumstances surrounding the commission of the act (*People v. Richardson*, 32 Ill.2d 472, 476, 207 N.E.2d 478), and proof that a person was present at the commission of a crime without disapproving or opposing it may be considered with other circumstances. (*People v. Hill*, 39 Ill.2d 125, 135, 233 N.E.2d 367.) In this case, the evidence showed that both men came to the scene together and separated. Both remained for about a half hour. Jones started to rob Hughes, and Cross remained where he was standing. Later, after stabbing Brown, Jones called out, "I got one," and Cross fled with him. The facts here are similar to those in *People v. Earls*, 82 Ill.App.2d 318, 320-321, 226 N.E.2d 458. In the *Earls* case, four men, including the defendant, approached the complainant. Two of the men shoved him inside the vestibule of an apartment building and robbed him while holding a knife to his throat. The defendant stood outside the door looking inside at the robbery. The police arrived a short time later, and the four men fled. The police arrested the defendant after a chase. The trial judge concluded, and the appellate court agreed, that the evidence showed that the defendant acted as a look out and that he was "as legally accountable as if he had actually held the knife to [the complainant's] throat and taken the money and wallet." A consideration of all the evidence in this case supports the conclusion that Cross was not an innocent bystander but instead was part of a plan to rob and that he "assented to the commission of the criminal act, lent his countenance and approval, and was thereby aiding and abetting the crime." *People v. Clark*, 30 Ill.2d 67, 72, 195 N.E.2d 157.

One of the persons who gave statements to the police at the scene was Leonard Mark, who owned the store at 3024 West Madison. He did not see the crime occur. At a pre-trial motion to suppress the identification testimony, the State disclosed that, since it was unable to locate Mack, he would not be called as a witness. Bates, Hughes and Bigelow testified on the motion, and all were asked questions by the defense attorneys concerning Mack's presence and the description he had given to the police. Some days later, after the jury had been selected, Mr. Nixon, the attorney for Jones, asked the judge, in order to avoid a mistrial, to instruct the witnesses not to mention the fact that Mack had identified the defendants. The judge noted that such testimony was hearsay and expressed the hope that nothing would occur that would cause a mistrial. The assistant state's attorney said that he did not intend to introduce such testimony. The judge then said: "Certainly don't phrase any question to bring out an improper answer." The assistant state's attorney gave both defense counsel the Grand Jury

testimony of "all witnesses involved" in the case and the police reports of all officers that were going to testify.

After Bigelow had testified on direct examination without mentioning Mack, he was cross-examined as follows:

"Mr. Smith:

Q. Officer Bigelow, did you have anything more than a brief description at the time you went to the hospital?

A. Yes, I had a positive identification by eye witnesses.

Q. Where did you get the positive identification?

A. From the scene.

Q. Who gave you that positive identification, that you refer to as positive?

A. Three eye witnesses.

Q. And who were the three eye witnesses?

A. Jerry Bates, Otis Hughes and a man by the name of —— I believe Leonard Mack.

Q. Now, can you tell us what that description was that you refer to as being positive, what was that positive description?

\* \* \*

Mr. Nixon:

Q. Officer, I showed you Defendant's Exhibit No. 3, for identification, which is a police report, and, Officer, I ask you if you stated in your report, 'Both subjects were viewed by the aforementioned eye witnesses and they both identified the two subjects as the same ones that stabbed the victim.'

Would you like to see your report?

Mr. Wolff:

Objection to that question.

\* \* \*

Mr. Nixon:

Q. Well, didn't you testify to three men instead of two identified someone here?

A. Yes, possibly a typographical error.

Q. Oh, this is a typographical error?

Mr. Wolff:

Object to counsel's remark.

A. It's possible.

The Court:

Overruled. You may proceed with your examination.

Mr. Nixon:

Q. But you remembered the three men coming up to the squad car one at a time?

A. One at a time, right.

\* \* \*

Q. And you asked each one of the three men whether these fellows in the back seat were the ones, is that right?

A. No, I said, 'Could you identify either of these men'?

Q. And all three of them, as you were saying, identified them, is that right?

A. That is correct.

Mr. Nixon:

I move for a mistrial, your Honor.

The Court:

Motion denied.

Mr. Wolff:

Let the record reflect counsel's conduct in front of the jury, your Honor."

After Bigelow had completed his testimony, Mr. Nixon in chambers again moved for a mistrial based on the testimony that Mack had identified the defendants. The motion was denied.

■■ After Nolan had testified on direct examination without mentioning Mack, the following occurred:

"Mr. Nixon:

Q. You interviewed a man named Mack, is that right?

A. Yes sir, I did.

Q. Did Mr. Mack say he saw the occurrence, the death of Mr. or the attack on Mr. Brown?

A. I don't recall if he witnessed the actual attack, no, sir.

\* \* \*

Mr. Wolff:

Q. On cross examination, Detective Nolan, you were asked I believe by one of the defense attorneys whether you asked Mr. Lawrence Mack if he saw the actual stabbing and I believe he said he did not see the actual stabbing, is that correct?

A. Yes, sir.

Q. What else did Mr. Lawrence Mack say to you concerning what he observed?

Mr. Nixon:

Objection.

The Court:

Objection is overruled.

The Witness:

Mr. Mack stated that he has a store also which is adjoining Mr. Hughes' store and that prior to this incident he observed two men come into his store and they were ———

Mr. Nixon:

Objection, Your Honor. This is hearsay.

The Court:

Objection is overruled.

Mr. Nixon:

My question was not directed to conversation, Your Honor.

The Court:

There certainly was a conversation. Proceed."

Nolan further testified Mack told him two men came into his store and were just looking around. Later, Nolan was present when Mack identified the two defendants in the squad car as the men he had seen in his store. This testimony was permitted over the objection of the attorney for Cross. That attorney examined Nolan again and brought out what Mack had told him and that Mack had identified the defendants in the squad car. He also brought out the fact that Mack had told the officer he did not see the occurrence. The defendants now contend that the testimony of the officers concerning the statement made by Mack was prejudicial error. We disagree. The record reflects the trial court's awareness of the problem and its gravity. He specifically warned all the parties to be careful in their questioning. Nonetheless, the attorney for Cross, who was aware that Mack had made some sort of identification at the scene, insisted upon cross-examining Bigelow and eliciting that fact. At that point, the attorney for Jones, who had initially urged the court to admonish the State not to go into Mack's statements, attempted to show that the officer was not telling the truth when he said that three men identified the defendants and, in doing so, again brought out the fact that Mack had identified them. All this testimony having been brought out by the defense despite the trial court's admonition, a motion for mistrial was made and, we hold, was properly denied. As was said in *People v. Burage*, 23 Ill.2d 280, 282—3, 178 N.E.2d 389:

"[T]he State is not responsible for questions asked by the attorney for the accused, and neither is it responsible for the answers to such questions by the State's witnesses. [Citations.]. If a defendant procures, invites or acquiesces in the admission of evidence, even though it be improper, he cannot complain [Citations.]"

Even then, the attorney for Jones insisted upon asking Nolan whether Mack told him he saw the attack on Brown, and Nolan answered: "I don't recall if he witnessed the actual attack, no, sir." At this point, the

jurors had heard Bigelow's testimony concerning three identifications and the attempt to discredit him by showing that in his report he had mentioned two eyewitnesses, rather than three. Under these circumstances the State properly was permitted to show through Nolan that there were in fact only two eyewitnesses to the actual attack on Brown but that Mack's identification placed them in his store, thus explaining any possible inconsistency in the testimony of Bigelow.

■■ The defendant, Jones, contends that his failure to object to the testimony concerning Mack's identification did not constitute a waiver of his constitutional right to confront the winesses against him citing *Henry v. Mississippi*, 379 U.S. 443, 451, 452, 85 S.Ct. 564. His reliance on *Henry* is misplaced. The United States Supreme Court remanded the case for an evidentiary hearing to determine whether the evidence supported a finding of waiver. The court said: "[W]e think that the deliberate bypassing of counsel of the contemporaneous-objection rule as a part of trial strategy would have that effect in this case." The *Henry* case was cited in *People v. Dowling*, 51 Ill.2d 370, 373; 282 N.E.2d 696, Like *Henry*, the *Dowling* case concerned a search and seizure question. The State did not offer or refer to a pair of shoes, but the defense attorney cross-examined a witness about them. The State then offered the shoes in evidence and the defense attorney objected. The trial judge, as here, noted that there was a search and seizure problem that might preclude the State from offering the evidence in chief. The defense attorney insisted that he was going to comment on the shoes because of the testimony he had elicited, but he persisted in his general objection to their admission. The shoes were admitted. The Illinois Supreme Court said: "Having introduced the matter, defendant cannot now complain of their presence. [Citation.] We believe, in these circumstances, that defense counsel's actions constituted a knowing waiver binding on petitioner. *Henry v. Mississippi*, [citation]; *People v. George*, 49 Ill.2d 372." The facts here supporting waiver are even stronger than in the *Dowling* case since the parties were put on notice even before trial that they were to avoid any mention of Mack. See also *United States v. Joseph*, (6th Cir.), 333 F.2d 1012.

On June 17, 1970, the State filed a list of witnesses which included the assertion that the place of offense was "[a]bout 3124 West Madison, Chicago." The evidence showed that the crime occurred somewhere between 3016 and 3024 West Madison Street. This, the defendant, Jones, contends, was a fatal variance.

■■ On September 1, 1970, the defendant filed a discovery motion which included a request for a specification of the place of the occurrence, and, if a show-up was conducted, where that show-up took place

and who identified the defendants. The State filed an additional answer in response to that motion on November 13, 1970, alleging that the defendants were identified by Otis Hughes and Jerry Bates at 3124 West Madison Street. At the hearing on the motion to suppress the identification, which was heard on December 23, 1970, Bates and Hughes both testified that Hughes' store is located at 3016 West Madison and Mack's was 3020 West Madison. What the defendants have referred to as a Bill of Particulars, which designation the State has apparently accepted, was an answer to a discovery motion, and not a Bill of Particulars. At the trial the attorney for Jones conceded when the point was raised: "Your Honor, I claim no surprise." There was no error in the court's ruling that the evidence of the address at which the crime occurred was proper. Even if the document filed by the State could be considered a Bill of Particulars, since the defendant was in no way prejudiced and since the address is not an essential ingredient of the crime of murder, the variance between the Bill and the proof was harmless.

■■ During *voir dire* examination one of the jurors disclosed that he had previously served on a civil jury. The following then occurred:

"Mr. Nixon:

Q. Now, in this case the burden of proof is different, the State has a far higher ———

Mr. Wolff:

Objection to defining reasonable doubt.

The Court:

Objection sustained. It is not a far higher, that is not true."

A hearing was then conducted in chambers in which the defense attorney argued that "proof beyond a reasonable doubt is the highest burden of proof known to our legal system," and that it "is a far higher burden." The court answered, "It is not far higher, it is beyond a reasonable doubt." The court then informed the defense attorney that he could explain to the jurors that the burden of proof in a criminal case was "higher" than the preponderance of the evidence, but he could not say that it was "far higher" or that it was the "highest proof possible." There was no error in the trial court's ruling. In *People v. Malone,* 126 Ill.App.2d 265, 270, 261 N.E.2d 776, the reviewing court upheld the trial court's refusal to permit the defense counsel to present his interpretation of reasonable doubt. The court reasoned that, if a trial court is precluded from defining the term in the instructions, it is evident why the court may deny "counsel an opportunity to offer his own comments on the meaning of 'reasonable doubt.'"

■■ Finally, the defendants maintain that their sentences were

excessive. Jones was 18 years old at the time of the occurrence, and Cross 23 and married with one child. Neither had any previous criminal record. Cross' minimum sentence is only one year greater than the minimum prescribed by law and his maximum conforms to the statutory guidelines applicable to other offenses. (Ill. Rev. Stat. 1973, ch. 38, sec. 1005—8—1.) Jones' eligibility for parole will begin after 20 years and the "flexibility of incarceration will permit the parole board to exercise the judgment contemplated by the sentencing and parole laws of our State." (*People v. Caldwell,* 79 Ill.App.2d 273, 287, 224 N.E.2d 634.) The sentence imposed by the trial judge, who is in a better position to make a proper determination as to punishment, should not be disturbed unless it is clearly evident that it is greatly at variance with the purpose and the spirit of the law or in excess of the proscriptions of the constitution which provides that all penalties should be proportioned to the offense. (*People v. Fox,* 48 Ill.2d 239, 269 N.E.2d 720.) Both defendants participated in a planned robbery; one of them was prepared to kill and did kill an innocent man. Under the circumstances of this case it would be inappropriate for us to substitute our judgment for that of the trial judge. See also *People v. Kendricks,* 4 Ill.App.3d 1029, 283 N.E.2d 273.

For the foregoing reasons the judgment of the circuit court is affirmed.

Judgment affirmed.

BURKE, P. J., and GOLDBERG, J., concur.